IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In re: | ) | Case No. BK23-80623 |
| | ) | |
| DANNIE and MARIA BENNETT, | ) | Chapter 12 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | _____ |
| | ) | |
| HEA CORPORATION, *et. al*, | ) | Case No. AP23-8025 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANNIE L. BENNETT, JR. and | ) | |
| MARIA J. BENNETT | ) | |
| | ) | |
| Defendants. | ) | |

The plaintiffs Jordan and Rene Mellican and HEA Corporation seek a judgment against the defendants Dannie L. Bennett, Jr., and Maria J. Bennett for fraudulent misrepresentation under Nebraska state law. They also ask the judgment be excepted from discharge. Jay D. Koehn and Donald Rison appeared for the plaintiffs. Andrew K. Joyce appeared for the defendants. Judgment will be entered against Mr. Bennett because he knowingly made multiple false written representations of material fact on which the Mellicans reasonably relied. The judgment is excepted from discharge under § 523(a)(2)(B) because he made the representations with an intent to deceive. Because no evidence was offered regarding conduct by Maria Bennett, all claims against her are dismissed.

**Findings of Fact**

The Mellicans long wanted to own their own business. In May 2015, they agreed to purchase the assets of Super Clean Job Site, subject to due diligence. Super Clean was owned by Bennett, and he was also its President. Bennett started Super Clean in 2003 to provide commercial cleaning services at industrial and construction job sites. The Mellicans wanted to purchase Super Clean because Jordan had experience in the construction industry. The

Mellicans and Bennett were brought together by Andrew Foxhoven, a business broker with Sunbelt Business Advisors. Sunbelt and Foxhoven represented the Mellicans as their "agent" and "advisor".[1]

The Mellicans completed their due diligence on August 14, 2016. The same day, the Mellicans and Bennett signed an asset purchase agreement. The Mellicans' entity, HEA, agreed to purchase the assets of Super Clean for $1.2 million. The sale closed August 26, 2016.[2] To fund the purchase the Mellicans obtained a $1,017,000 SBA loan from Wells Fargo. Bennett seller-financed $180,000 of the purchase price. HEA became a franchisee of Bennett's company, SCJS Franchising, Inc.

The asset purchase agreement contained several representations and warranties. Bennett represented and warranted:

- Super Clean's financial statements were accurate;

- Documents provided to the Mellicans did not contain an untrue statement of material fact and were not misleading;

- The absence of material liabilities other than as stated on the latest balance sheet;

- Super Clean employees had not received a pay increase other than ordinary increases; and

- Super Clean was in compliance with all applicable laws.

Shortly after closing, the Mellicans discovered Bennett's representations were false. Super Clean was not the robust business they were presented. The financial statements from January through July 2016 overstated gross income by over $400,000 and accounts receivable by almost $150,000. Super Clean had undisclosed liabilities.[3] It borrowed $125,000 on a line of credit

---

[1] Doc. #55.

[2] Doc. #113.

[3] Bennett represented gross revenue of $847,388.88 from January through July 2016. Accountant James Hervert reconstructed Super Clean's financial statements. According to Hervert, Super Clean had gross revenue of $464,822.30 on a cash basis and $399,574.59 on an accrual basis.

weeks before closing to address cash flow issues.[4] A listing purporting to detail Super Clean's current and future jobs was somewhat of a wish list. Nine Super Clean employees received raises the month of the closing.[5] The majority of Super Clean employees working on construction sites were not OSHA trained.[6] And Super Clean not only employed several undocumented workers, but it had also been fined for not verifying employees' legal status.

Bennett does not dispute his representations were false. He asserts he was not aware they were false when he made them. Bennett presented himself as an unsophisticated janitor, performing cleaning work while delegating business operations to his office manager, Lilly Berrios, and bookkeeper, Sharon Moore. According to Bennett, he was not responsible for the false representations; Berrios, Moore, and Foxhoven were.

The false representations occurred during due diligence. On June 13, 2016, Foxhoven sent the Mellicans financial documents regarding Super Clean, including profit and loss statements ("P&Ls") and balance sheets generated in QuickBooks, a summarized accounts receiving aging report, and Super Clean's tax returns.[7] Based upon the dates some of the QuickBooks reports were generated, the documents appear to have been part of an earlier potential buyer's due diligence. The Mellicans forwarded the information to their accountant and requested updated financial statements. The financial statements painted a promising picture.[8] Super Clean no longer had a key and profitable project with Google, but the sales numbers indicated Super Clean was profitable enough for Jordan to pay his SBA loan, pay the required franchise royalty payments, and replace his salary.

The Mellicans needed to finance the purchase. They applied for an SBA loan from Wells Fargo. Wells Fargo did its own due diligence, hiring an independent business valuator. Foxhoven provided Wells Fargo the tax

---

[4] HEA paid the line of credit at closing.

[5] Doc. #97. Bennett gave employees raises totaling $2,446.72 per month.

[6] Doc. #98. Sixty-one percent of Super Clean employees were not OSHA trained. HEA trained them at its own cost. Each employee had ten hours of downtime.

[7] Doc. #107. The documents included a Jan-Dec 2014, P&L report run Aug 20, 2015, and a Jan-Dec 2015, P&L report run on March 3, 2016. The other reports were run on April 6 and 7, 2016, including March 31 balance sheets for the years 2014, 2015, and 2016. All QuickBooks reports were purportedly on an accrual basis.

[8] Doc. #29.

returns and financial statements.[9] Wells Fargo required Bennett verify their accuracy. On July 25, 2016, Bennett signed off on the January through May 2016 P&Ls, May 31, 2016 balance sheet, May 31, 2016 summary accounts receivable report, and tax returns.[10] The next day, July 26, 2016, Wells Fargo's valuator e-mailed the Mellicans several questions.[11] One of the questions was why revenues decreased in 2016 but, according to the P&L's, profit margins increased. Jordan responded Super Clean recently lost a large Google project. Super Clean's work now involved smaller projects with higher margins. Jordan testified he obtained this information from Bennett.

Wells Fargo also requested copies of Super Clean's bank statements and payroll statements. Foxhoven obtained and forwarded three months of the bank statements on July 26.[12] From April 1 through June 30, 2016, Super Clean's operating bank account balance decreased by $412,096.89. Each month withdrawals exceeded deposits.[13] Jordan expressed concern, "there are many withdrawals and not a whole lot of deposits".[14] Foxhoven responded he would try to find out why. It is not clear, what, if anything, Foxhoven did in response. Nevertheless, Mellican testified his concerns were satisfied because Super Clean's P&Ls showed the business had significant sales. It was profitable. And the financial statements stated what Jordan called "huge" amounts invoiced in July. Mellican, familiar with the construction industry, saw no red flags. He understood construction to be a "slow pay" industry. Wells Fargo's business valuator reviewed many of the same financial statements. He agreed $1.2 million was a fair price. He approved the loan.[15]

---

[9] Doc. #106.

[10] Doc. #90.

[11] Doc. #53.

[12] Doc. #103.

[13] Doc. #103. The beginning balance of the operating account in April 2016 was $494,553.86. The ending balance for April was $283,563.24, for May was $142,675.04, and for June was $82,456.97. Super Clean deposited $90,844.29 in April, $28,201.92 in May, and $49,417.15 in June. The July statement, which Mellican received three days before closing, showed deposits of $43,620.73 and an ending balance of $38,710.04. Doc. #47. Jordan testified he was not concerned because of the high sales and receivables on the P&Ls.

[14] Doc. #52.

[15] The business valuator, who reviewed the same information as the Mellicans stated, "Looks like you are getting a nice price for the company". Doc. #110.

On August 12, 2016, the Mellicans received additional financial reports. According to the reports, Super Clean was owed receivables of $370,421.14.[16] The P&Ls for January through July showed gross sales of $845,511.78, and operating net income of $317,634.53.[17] The balance sheet as of July 31 showed cash totaling $99,861.32.[18] It showed short-term liabilities of $10,884 and long-term liabilities of $19,857. The reports confirmed for Jordan how Super Clean was profitable but was bleeding cash.

So, what went wrong with the financial statements? The answer is simple – accrual accounting, or more precisely, the lack of accrual accounting.  There are two primary methods of accounting, accrual accounting and cash accounting. Cash accounting focuses on cash flow – cash in and cash out. Cash accounting recognizes revenue when received and expenses when paid. Accrual accounting, on the other hand, recognizes revenue and expenses when earned or incurred, regardless of whether cash is received or paid. Accrual accounting uses journal entries for accounts payable and receivable to evaluate a business's financial performance. Of the two methods, only accrual accounting satisfies generally accepted accounting principles.

The Mellicans wanted accrual basis financial statements. They knew Super Clean was a seasonal business in the "slow pay" construction industry. They wanted to see when sales occurred and when work was performed, and to track monthly accounts receivable. They could not track monthly sales and receivables with cash basis statements. But Super Clean did not operate on an accrual basis. It operated on a cash basis. It did not track accounts receivable in QuickBooks. It tracked them outside its financial statements in Microsoft Excel on what it called an "A/R aging" spreadsheet.

The cash basis statements under which Super Clean operated can be converted to accrual basis statements. The conversion requires multiple journal entries in the accounting records. Moore attempted the conversion. She was not successful. She did not make the proper journal entries to QuickBooks. Instead, she added the receivables for each month to the cash sales, without making required accounting adjustments. This materially and artificially inflated Super Clean's sales numbers.

---

[16] Doc. #71; Doc. #91.

[17] Doc. #100.

[18] Doc. #105.

Bennett blamed Moore for the inaccurate financial statements.[19] Bennett had charged Moore with responding to inquiries from the Mellicans. Moore was the bookkeeper. She had a business degree with an emphasis in accounting. She created the financial statements. She provided them. Bennett, on the other hand, does not understand accounting principles or financial statements. Though he signed off on their accuracy, he did not review them. He did not know whether the statements fairly represented the financial condition of Super Clean. He trusted Moore.

Moore in turn blamed Foxhoven. As part of the first potential sale, Moore sent Foxhoven cash basis financial statements.[20] Foxhoven asked why receivables were not on the statements. Moore told Foxhoven Super Clean tracked accounts payable through an Excel spreadsheet. She e-mailed him the spreadsheet on June 21, 2016.[21] Foxhoven did not want the spreadsheet. He wanted the receivables on the QuickBooks reports. Moore testified she did as she was asked – she added the receivables to the QuickBooks reports. Foxhoven testified he did not ask Moore to add the accounts receivable to sales. He simply asked for accrual statements detailing receivables. He did not instruct Moore how to convert cash statements to accrual statements. He was not an accountant. He did not know how.

Bennett asserts because Moore e-mailed Foxhoven the A/R aging spreadsheet, Foxhoven had information establishing the falsity of Bennett's representations about Super Clean's financial statements. He notes on June 16, 2016, Foxhoven inquired why Super Clean sales in May 2016 totaled only $30,000.[22] Moore promptly responded:

---

[19] Moore began working as an independent contractor for Super Clean in 2013. She went to Super Clean's offices approximately two times per week. By 2016 she was working sixteen to twenty hours a week.

[20] This does not explain why the information Moore provided the first buyer included a Jan-Dec 2014, QuickBooks P&L run August 20, 2015, purportedly on an accrual basis. *See supra* note 7.

[21] Doc. #43. Moore emailed the same information to Foxhoven during the previous sale. Doc. #42. On April 6, 2016, she e-mailed Foxhoven, "We do not keep track of our A/R through quick books, rather we do it by excel spreadsheet…. You can go through each month and get an idea of how quickly jobs are paid, sales tax, retain-age outstanding, etc."

[22] Doc. #48. The financial statement Foxhoven reviewed does not appear to be in evidence.

> In the notes I said to that those numbers are of cash received not actual sales. *The sales would be discovered in the A/R aging that I will forward to you* as soon as Lilly sends it to me. Those checks or "sales" numbers in May would be for work we did in March 2016, which is our slowest month.

(emphasis added).

The A/R aging spreadsheet was prepared by Berrios each month and was broken down by month. Each month included columns listing individual invoices by date, amount, and amount paid. The spreadsheet listed Super Clean invoices totaling $261,130.05 from January through May 2016.[23] There is no evidence in what detail Moore explained the spreadsheet to Foxhoven other than as stated in the e-mails.

Foxhoven did not forward the A/R aging spreadsheet to the Mellicans. He also was not very forthcoming with information. He did not inform the Mellicans Super Clean operated on a cash basis. He did not inform them Super Clean did not track receivables in QuickBooks. He did not inform them Super Clean tracked receivables in a spreadsheet. He did not inform them he asked Moore to adjust the cash basis statements.

Foxhoven, a high school graduate with no formal business or accounting training, alone decided what financial records and statements he deemed responsive to the Mellicans' requests. Foxhoven admitted he ignored documents the Mellicans did not specifically request. He also did not forward a document if he did not understand it. According to Foxhoven, the A/R aging spreadsheet met both conditions.

To justify his reticence, Foxhoven sought refuge in Sunbelt's Agreement for Acquisition Services.[24] Under the agreement, Sunbelt required all communications between the Mellicans and Super Clean occur through Sunbelt. The agreement also provided:

---

[23] Invoices totaled $62,296.16 for January, $36,750.31 for February, $81,741.74 for March, $30,774.54 for April, and $49,567.30 for May. Of those amounts, $154,287.74 was listed as paid by the end of May.

[24] Doc. #55.

> Sunbelt will, on reasonable request, present documents, records and information generated or located by Sunbelt to Buyer for review.

Foxhoven construed this language to mean he had no obligation to turn anything over to the Mellicans unless they specifically requested it. He also minimized his duty to the Mellicans. Foxhoven and Sunbelt were only a conduit. If the Mellicans desired information, Foxhoven made the request. Foxhoven reviewed the response from Super Clean. If it matched the request, he sent it to the Mellicans. Foxhoven did not inform Super Clean of his self-perceived limitations on his agency.

Bennett focuses primarily on the A/R aging spreadsheet and Foxhoven's lackadaisical communication. But Bennett's false representations extended beyond financial statements. They included false job reports[25], undisclosed liabilities, undocumented workers, and undisclosed pay raises.

For these false representations, Bennett again shifted responsibility and minimized his role and his knowledge: He owned the company. He was its President. But he was a janitor. He relied on Moore. He relied on Berrios. He went to the office one or two times a week to "check in". It was not his job to ensure others performed their work responsibly. He did not know what jobs Super Clean had. He did not know about cash flow issues. He did not verify workers' legal status.

Bennett's trial testimony was inconsistent with his deposition testimony. At trial he did not look at company bank statements. During his deposition he did. At trial he did not review invoices. During his deposition he reviewed the A/R aging spreadsheet and sales spreadsheet with Berrios monthly. At trial he rarely accessed QuickBooks. During his deposition he logged in monthly.

Bennett's testimony was also refuted. Moore testified she discussed cash flow and bank account balances with Bennett whenever Super Clean experienced cash flow issues.[26] Super Clean had consistently poor cash flow from January 2016 through July 2016. Text messages between Bennett and Moore

---

[25] On August 16, 2016, Super Clean provided the Mellicans a "List of Current Contract/WIP/Future Contracts". The list included $23,480 in "Monthly Contracts". The contracts included completed contracts which would not generate post-closing revenue. Actual monthly contracts were approximately $1,100 per month. The list included "Contracts Pending to Start" with revenue totaling $155,059.84. These contracts had not all been awarded to Super Clean. The list was a fantasy.

[26] Doc. #134 (39:8-24).

establish Bennett knew the company needed to borrow $125,000 in early August to address its cash flow issues.[27] Moore also refuted Bennett's testimony about the job list. Bennett testified Berrios compiled the list; he was not aware of the jobs. Moore testified Bennett "absolutely" had input into the job list, along with Berrios, and herself. Regarding undocumented workers, Bennett personally signed, under penalty of perjury, the I-9 forms verifying employees' eligibility.[28] He knew the government investigated Super Clean for undocumented workers and Super Clean agreed to pay a fine for violations.

The Mellicans offered evidence of what they characterize as post-closing conduct evidencing Bennett's intent to deceive them. Moore and Berrios continued their roles for HEA after closing. Jordan confronted Bennett in November 2016 and asked to reverse the transaction. A second meeting occurred in December. After the second meeting, Bennett ghosted the Mellicans. On December 22, Bennett texted Moore and instructed her to change the Super Clean QuickBooks password.[29] Bennett investigated "cleaning out the Super Clean account today or the end of the year or. Before this gets ugly" (sic). He then transferred the Mellicans' payment from Super Clean to another entity, purportedly for tax purposes. On December 27, 2016, Bennett instructed Moore to "Have Lilly delete any Super Clean emails from my attorneys that were sent to D Bennett at Super Clean job site".[30]

Kurt Meisinger, CPA, performed a forensic accounting of Super Clean's financial statements. Meisinger determined Super Clean's sales from January through July 2016 equaled $464,922.30, not the $845,511 represented by Bennett.[31] During the period Super Clean had a net operating loss of $70,400.17. Meisinger opined the financial statements provided to the Mellicans purported to be accrual basis statements but were not accurate under any recognized accounting methodology.

Meisinger also opined the value of Super Clean's operating assets purchased by the Mellicans as of August 26, 2016, equaled $256,000. His value did not

---

[27] Doc. #74.

[28] On the first day of his testimony, Bennett testified the signature may have been a stamp Berrios affixed to the form. The next day, he recanted.

[29] Doc. #68.

[30] Doc. #69.

[31] Doc. #63; Doc. #109.

include a non-compete agreement Bennett signed. Bennett testified the parties stipulated the value of the agreement was $100,000. Meisinger did not include this amount in his valuation, and its terms are not in evidence.[32] As additional evidence of consequential damages, the Mellicans offered a cash basis profit and loss statement by year August 2016 through May 2024.[33]

Although named as a defendant, no evidence was offered regarding any wrongdoing by Mrs. Bennett.

## Conclusions of Law

### *Judgment Under Nebraska Law*

The Mellicans seek a judgment under Nebraska state law for fraudulent misrepresentation.[34] To prevail, the Mellicans must prove the following elements by a preponderance of the evidence:

> (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely upon it; (5) that the plaintiff reasonably did so rely; and (6) that the plaintiff suffered damage as a result.

*Cao v. Nguyen*, 607 N.W.2d 528, 532 (Neb. 2000). Several elements are not disputed. Bennett made false representations with the intent the Mellicans rely upon them. The Mellicans suffered damage.

Bennett testified he did not know the representations were false. Even accepting his testimony to be true, Bennett acted with reckless indifference.

---

[32] The non-compete is referenced in the Asset Purchase Agreement. Doc. #54. The first page and the signature page are in evidence. Doc. #113 (Pgs. 106-107). It is not clear why a covenant not to compete was executed and if its value was really $100,000. The franchise agreement between SCJS Franchising, Inc., and HEA grants HEA an exclusive franchise in its "Protected Area". Doc. #113 (Pg. 2). The protected area is purportedly defined under an addendum. *Id*. (Pg. 30). The addendum also is not in evidence.

[33] Doc. #58.

[34] The Mellicans' complaint includes theories of recovery for breach of contract and negligent misrepresentation.

> Reckless indifference as to truth arises when the defendant makes the representation even though aware that he does not know whether it is true or false—where he knows that he lacks knowledge as to its truth or falsity—and nonetheless makes the representation without regard to that lack of knowledge.

*Hoffman v. Stamper*, 385 Md. 1, 42, 867 A.2d 276, 300 (2005); *see also* 37 Am. Jur. 2d *Fraud and Deceit* § 117 ("[O]ne who makes a statement as if based on personal knowledge or makes such a positive and unqualified statement as implies knowledge on the speaker's part, when in fact the speaker has no knowledge on the subject, is guilty of fraud[.]"). Bennett testified he did not understand financial statements. But he affirmatively verified their accuracy. He made no effort to determine whether his representations were accurate. He did not have a basis to positively represent their accuracy.

But the record establishes Bennett knew his representations to be false.

> In a fraud case, direct evidence is not essential, but proof of fraud drawn from circumstantial evidence must not be guesswork or conjecture; such proof must be rational and logical deductions from the facts and circumstances from which they are inferred.

*Four R Cattle Co. v. Mullins*, 570 N.W.2d 813, 816 (Neb. 1997).

Bennett was not the simple janitor he presented himself. His testimony was not credible. Bennett is a highly successful businessman. According to tax returns, he grew Super Clean's sales from $1.8 million in 2013 to $3.76 million in 2015, with a pre-tax profit during the same time from $435,896 to $605,108. Bennett knew the condition of his business. He understood how to read a bank statement. He reviewed invoices. He reviewed the A/R aging spreadsheet. Moore kept him apprised of cash flow issues. He knew Super Clean borrowed $125,000 immediately before closing to address cash flow issues. He may not have understood the intricacies of financial statements. But the errors were in the sales and receivables numbers, of which Bennett was aware. Bennett did not have to understand accrual accounting to know the financial statements grossly overstated sales and accounts receivable.

Also, it is undisputed Bennett knew Super Clean hired undocumented workers and was fined by the government. He knew the employees were given raises. He knew Super Clean borrowed money to address cash flow problems immediately before closing. He assisted in compiling the job listing.

Bennett also asserts the Mellicans did not reasonably rely on the false information they were provided. He asserts they did not exercise ordinary prudence.

> [W]hether the plaintiff exercised ordinary prudence is relevant to whether the plaintiff justifiably relied on the misrepresentation when the means of discovering the truth was in the plaintiff's hands…. As other courts have noted, a plaintiff 'may not close his eyes to what is obviously discoverable by him.'

*Lucky 7, L.L.C. v. THT Realty, L.L.C.*, 775 N.W.2d 671, 676 (Neb. 2009) (citation omitted).

In making this argument, Bennett focuses on the falsity of the financial statements. Super Clean provided Foxhoven the A/R aging spreadsheet. Bennett argues, if Foxhoven had sent it to the Mellicans, the Mellicans would have had a "clear signal" the financial statements were not reliable. This raises two questions. First, is the knowledge of the contents of the A/R aging spreadsheet, in the hands of Foxhoven, imputed to the Mellicans? Second, if imputed, did it provide the Mellicans the means of discovering the truth?

As the Mellicans' agent, Foxhoven's knowledge is imputed to the Mellicans. Under Nebraska law:

> It is the duty of an agent to communicate to his principal all the facts concerning the service in which he is engaged that come to his knowledge in the course of his employment, and this duty, in a subsequent action between his principal and a third person, he is ... conclusively presumed to have performed.

*City of Gering v. Patricia G. Smith Co.*, 337 N.W.2d 747, 751 (1983) (citation omitted). The A/R aging spreadsheet constituted facts concerning the services for which Sunbelt and Foxhoven were engaged. Foxhoven breached his duty to the Mellicans by not providing it to the Mellicans.

Foxhoven's position that he had no contractual obligation to forward the A/R aging spreadsheet to the Mellicans is absurd. Sunbelt's agreement provides, "Sunbelt will, on reasonable request, present documents, records and information, generated or located by Sunbelt to Buyer for review." Foxhoven contends the Mellicans did not request the spreadsheet. But they did. The Mellicans requested information regarding Super Clean's financial condition, with particular emphasis on Super Clean's sales and accounts receivable. The

A/R aging spreadsheet is a document located by Sunbelt. It concerned sales and accounts receivable.

Foxhoven and the Mellicans' position appears to be, unless the Mellicans specifically asked for Super Clean's "A/R aging spreadsheet," Foxhoven had no duty to turn it over. Under the same logic, if Foxhoven received an e-mail from Bennett stating, "I can't believe the Mellicans believe our financial statements are accurate", Foxhoven had no duty to forward it unless the Mellicans specifically asked for e-mails stating financial statements are false. Foxhoven and Sunbelt failed the Mellicans. Sunbelt employed a well-intentioned high school graduate who lacked the education and training to competently fulfill his duties to Sunbelt's clients.

The Mellicans contend Foxhoven could not disclose the A/R aging spreadsheet because Sunbelt operates in a "confidential industry which requires secrecy and duties of confidentiality to prior clients". They note Foxhoven first learned of and received the A/R aging spreadsheet when representing a previous prospective purchaser of Super Clean's assets. They argue:

> Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person.

*Restatement (Second) of Agency* § 381 (1958).

The Mellicans argue, under the terms of its agreement for acquisition services, Sunbelt must keep "any information pertaining to the Company … in confidence".[35] Sunbelt also could not use such information "to the detriment of" Super Clean.

The Mellicans' argument fails. The A/R spreadsheet was part of an earlier purchase. But it was also part of the information Moore sent to Foxhoven as part of the Mellicans' purchase. Super Clean wanted Foxhoven to share it. Also, assuming Foxhoven had a duty to keep information from the prior transaction confidential, he completely ignored it. On June 13, 2016,

---

[35] For some reason Sunbelt's agreement defines the "Company" to be Commercial Seeding Contractors. Doc. #55.

Foxhoven sent the Mellicans Super Clean's financial information Foxhoven obtained during the previous transaction.[36]

Even though Foxhoven's knowledge is imputed to the Mellicans, the knowledge is not sufficient to put the Mellicans on notice Super Clean sales numbers could be false. The Mellicans reasonably relied on the financial statements and acted with ordinary prudence. Moore informed Foxhoven Super Clean tracked receivables on the A/R aging spreadsheet. She e-mailed Foxhoven a copy. But Moore did not fully explain the spreadsheet. She did not represent the spreadsheet tracked all sales. She did not represent the spreadsheet tracked all work performed, including work not yet invoiced. To determine the actual sales and receivables required a forensic accountant. The Mellicans' forensic accountant testified the A/R spreadsheet alone was insufficient to determine the actual sales.

The false representations also included more than just receivables and the sales. Bennett offered no evidence the Mellicans had the means to discover the falsity of the recurring job listing, the purported absence of material liabilities, the purported compliance with employment laws, and the absence of pay increases. The Mellicans are entitled to judgment on their claim for fraudulent misrepresentation.[37]

For damages the Mellicans are entitled to "the difference between the article or thing if it had been as represented and its actual value." *Beveridge v. Miller-Binder, Inc.*, 131 N.W.2d 155, 158 (Neb. 1964); *see also Burke v. Harman*, 574 N.W.2d 156, 175 (Neb. Ct. App. 1998) (adopting the measure of damages for fraudulent misrepresentation in the *Restatement (Second) of Torts* – the pecuniary loss including "the difference between the value of what he has received in the transaction and its purchase price", sufficient to confer the benefit of the contract.). Benefit of the bargain damages are the $1.2 million purchase price, less the $180,000 unpaid financed by Bennett, less the $256,000 value testified to by the Mellicans' expert, for a total of $764,000. The $180,000 promissory note is cancelled.

Bennett asserts he is entitled to an offset of $72,000 for accrued but unpaid interest on the $180,000 promissory note and $100,000 for the agreed value of the covenant not to compete. Bennett is not entitled to a credit for interest on the promissory note. The damages are calculated to give the Mellicans the

---

[36] *See supra*, note 7.

[37] The Mellicans established their claims for breach of contract as well.

benefit of the bargain. The benefit of the bargain is determined at the time of the transaction, not eight years later. The court also declines to deduct $100,000 for the covenant not to compete. Bennett did not establish the "agreed" value was the actual value of the covenant. The covenant is not in evidence to determine its validity. The covenant also appears unnecessary under the franchise agreement.

In their brief, for the first time, the Mellicans request consequential damages. They seek $50,000 in Jordan's lost wages from the time he quit his job in August 2016 until he obtained new employment in February 2017. They seek $300,000 in funds they contributed to HEA to keep it afloat. They seek $318,403.61 in interest they paid on their SBA loan. They seek $3,091 in professional fees. They seek $50,000 per year for five years as compensation for Jordan running the business without pay. These are consequential damages under Nebraska law.[38]

> Consequential damages, as opposed to direct damages, do not arise directly according to the usual course of things from a breach of contract itself. Rather, they occur as a consequence of special extracontractual circumstances known or reasonably supposed to have been contemplated by the parties when the contract was made. Direct damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain—while consequential damages refer to economic harm beyond the immediate scope of the contract. One common example of consequential damages is the lost profits or revenues from outside parties, lost business opportunities, or other sums forgone as a result of a breach of contract.

*U.S. Pipeline, Inc. v. N. Nat. Gas Co.,* 930 N.W.2d 460, 476 (Neb. 2019).

The Mellicans cannot recover consequential damages because they did not plead them. Consequential damages are special damages. "If an item of special damage is claimed, it must be specifically stated." Fed. R. Civ. P. 9(g); *see also* Neb. Ct. R. § 6-1109 ("When items of special damage are claimed, they shall be specifically stated."); *Bailey v. Amisub (Saint Joseph Hosp.), Inc.*, 489 N.W.2d 323, 328 (Neb. Ct. App. 1992) ("Lost earnings up to the time of trial are an element of special damages and must be specifically pleaded and proved."); *Airborne Freight Corp. v. C.R. Lee Enterprises, Inc.*, 847

---

[38] Some of these items could be considered an attempt to recover lost profits. Had the business been profitable, Jordan could replace his salary and potentially not infuse additional cash. A claim for lost profits was also not pled or established.

S.W.2d 289, 295 (Tex. App. 1992) ("Consequential damages, unlike general damages, are not presumed to be the necessary and usual result of the wrong. Plaintiff must therefore plead and prove them separately.").

Even if the Mellicans had pled special damages, they did not prove them to a reasonable degree of certainty.

> A plaintiff's evidence of damages may not be speculative or conjectural and must provide a reasonably certain basis for calculating damages. Proof of damages to a mathematical certainty is not required, but a plaintiff's burden of offering evidence sufficient to prove damages cannot be sustained by evidence which is speculative and conjectural. The proof is sufficient if the evidence is such as to allow the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness.

*Sanford v. Clear Channel Broad., Inc.*, 719 N.W.2d 312, 319 (Neb. Ct. App. 2006) (citations omitted).

The Mellicans offered virtually no documents supporting an award of consequential damages. The testimony regarding cash infusions consisted of Jordan testifying they infused cash and were "still like negative 300 in the hole". They offered no checks, no loan documents, no terms, no dates of payment, and no amounts repaid. They did not address whether other unanticipated conditions (such as Covid-19) affected profitability. Regarding the $50,000 in lost wages for 2016, Jordan testified he quit his job in August 2016. He made "approximately" $120,000 per year. He obtained new employment in February 2017. He provided no pay stubs, W2s or tax returns showing his income. He offered no time sheets for time spent at HEA. In their brief they first seek $318,403.61 for "interest on SBA loan", a number not testified to, but which is listed on Doc. 58 under "Interest Expense". There is no evidence this accounting item was for the SBA loan, or whether it included other loans. They seek $50,000 per year for five years as compensation for Jordan running the business without pay. This number appears to be picked from thin air.

The Mellicans seek pre-judgment interest under Nebraska statute. Their request is denied. The specific statute they reference in their brief provides:

> Unless otherwise agreed, interest shall be allowed at the rate of twelve percent per annum on money due on any instrument in writing, or on settlement of the account from the day the balance shall

> be agreed upon, on money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof, and on money loaned or due and withheld by unreasonable delay of payment. Unless otherwise agreed or provided by law, each charge with respect to unsettled accounts between parties shall bear interest from the date of billing unless paid within thirty days from the date of billing.

Neb. Rev. Stat. § 45-104. The court must give this statute its "plain and ordinary meaning". *Brook Valley Ltd. P'ship v. Mut. of Omaha Bank*, 825 N.W.2d 779, 791 (Neb. 2013). "Section 45-104 applies to four types of judgments." *Farm & Garden Ctr., L.L.C. v. Kennedy*, 921 N.W.2d 615, 633 (Neb. Ct. App. 2018). Of the four, the judgment is not on account of a settlement of an account, money received without consent, or money loaned or due. The only possible basis is "money due on an instrument in writing."

The judgment awarded in this case is not on account of an instrument. An instrument is defined as a "writing that evidences a right to the payment of a monetary obligation." *See* Neb. U.C.C. § 9-102(a)(47). Nebraska courts have construed an "instrument in writing" under the interest statute to include "written invoices and billing statements". *See Farm & Garden Ctr., L.L.C. v. Kennedy*, 921 N.W.2d at 633. It includes a devise in a will. *See Peterson v. Abbott (In re Estate of Peterson)*, 433 N.W.2d 500, 502 (Neb. 1988). It includes an escrow agreement. *See Valley Cnty. Sch. Dist. 88-0005 v. Ericson State Bank*, 790 N.W.2d 462, 465 (Neb. Ct. App. 2010). An invoice, a lease, and an escrow agreement evidence a right to payment. The writing in this case is the asset purchase agreement. The agreement is not an "instrument". It does not evidence a right for the Mellicans to receive payment. It references an obligation to pay Bennett. The Mellicans' right to payment in this case arises not from an instrument, but from the tort of fraudulent misrepresentation.

The Mellicans seek a declaration excusing them from paying franchise fees to SCJS Franchising, Inc. Bennett requests any judgment be set off by the same amount. Both requests are denied. SCJS Franchising, Inc. is not a party to this lawsuit. As the Mellicans state in their brief, "a person must be made a party in the capacity or capacities in which it is desired to bind him." *State ex rel. Dunn v. Wiegand*, 512 N.W.2d 419, 425 (Neb. Ct. App. 1994). The court will not bind a non-debtor non-party. In addition, the franchise fees are a post-closing obligation and did not impact the value of Super Clean for the purpose of awarding the Mellicans damages for the benefit of their bargain.

*Dischargeability Under the Bankruptcy Code*

The Mellicans assert their judgment is excepted from discharge under 11 U.S.C. § 523(a)(2)(B).[39] An action under state law to establish a debt is separate from a determination of the dischargeability of the debt in bankruptcy. *Tatge v. Tatge (In re Tatge)*, 212 B.R. 604, 609 (B.A.P. 8th Cir. 1997).

The bankruptcy discharge is the vehicle through which the Bankruptcy Code gives honest but unfortunate debtors a fresh start. *See McDermott v. Petersen (In re Petersen)*, 564 B.R. 636, 644 (Bankr. D. Minn. 2017). The Code contains multiple exceptions from discharge. These exceptions are "narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code." *Willmar Elec. Servs. v. Dailey (In re Dailey)*, 592 B.R. 341, 349 (D. Neb. 2018) (citing *Community Fin. Grp. v. Fields (In re Fields)*, 510 B.R. 227, 233 (B.A.P. 8th Cir. 2014)).

To except a debt from discharge under 11 U.S.C. § 523(a)(2)(B), the creditor must prove, by a preponderance of the evidence, the debtor obtained money by (1) use of a materially false statement in writing; (2) pertaining to the debtor or an insider's business's financial condition; (3) on which the plaintiff reasonably relied; and (4) which the debtor made with the intent to deceive the plaintiff. *See* 11 U.S.C. § 523(a)(2)(B); *Jacobus v. Binns (In re Binns)*, 328 B.R. 126, 130 (B.A.P. 8th Cir. 2005); *Northland Nat'l Bank v. Lindsey (In re Lindsey)*, 443 B.R. 808, 813 (B.A.P. 8th Cir. 2011).

It is undisputed Bennett made a materially false representation in writing about Super Clean's financial condition. Super Clean is an "insider" under 11 U.S.C. § 101(31). As with the misrepresentation claim under state law, Bennett contends the Mellicans did not establish they reasonably relied upon the false statements. They also contend the Mellicans did not establish an intent to deceive.

---

[39] They also assert exceptions to discharge under § 523(a)(4) (fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny) and § 523(a)(6) (willful and malicious injury). Neither claim was established. In their complaint the Mellicans asserted a claim under "523(a)(2)", and referenced "false pretenses", which falls under § 523(a)(2)(A). In their brief, however, they assert "§ 523(a)(2)(B) which is the applicable provision in this proceeding" not § 523(a)(2)(A).

The Mellicans established they reasonably relied upon the statements for the purposes of an exception to discharge.

> Reasonable reliance is determined by looking at the totality of the circumstances. The court may consider if there were any "red flags" that would have alerted the creditor to the possibility that the financial statement was not accurate and whether minimal investigation would have revealed the inaccuracy.

*First Neb. Educators Credit Union v. Scott (In re Scott)*, Adv. No. 12-8013, 2012 WL 1970245, at *2 (Bankr. D. Neb. May 31, 2012) (citations omitted). For the reasons stated in the previous section, the information in Foxhoven's possession was not a red flag.

The Mellicans established Bennett had an intent to deceive. Establishing such intent does not require proof of "malevolence or personal ill-will; all it requires is a showing of an intent to induce the creditor to rely and act on the misrepresentations in question." *AGP Grain Coop. v. White (In re White)*, 315 B.R. 741, 748 (Bankr. D. Neb. 2004) (citations omitted). Direct proof of intent is often impossible to obtain. Therefore "the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *Northland Nat'l Bank v. Lindsey (In re Lindsey)*, 443 B.R. 808, 815 (B.A.P. 8th Cir. 2011) (quoting *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987)).

> A creditor may establish such intent by proving reckless indifference to or reckless disregard of the accuracy of the information in a debtor's financial statement.

*NAFCO Fed. Credit Union v. Lawson (In re Lawson)*, 308 B.R. 417, 423 (Bankr. D. Neb. 2004); *see also Toye v. O'Donnell (In re O'Donnell)*, 728 F.3d 41, 47 (1st Cir. 2013) ("intent to deceive under section 523(a)(2)(B) may be demonstrated by the debtor's knowledge of, *reckless* indifference to, or *reckless* disregard for the written statement's falsity") (citing *Nat'l Union Fire Ins. Co. of Pittsburgh v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 301 (2d Cir. 1996); *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1118–19 (3d Cir. 1995); *Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 482 (5th Cir. 2009). Likewise:

> Intent to deceive may be found if any of the following are true: the maker of the misrepresentation "(a) knows or believes that the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation that he states or implies; or (c) knows

> that he does not have the basis for his representation that he states or implies."

*Dewitt v. Stewart (In re Stewart)*, 948 F.3d 509, 523 (1st Cir. 2020).

> Factors to consider include whether the debtor was intelligent and experienced in financial matters, and whether there was a clear pattern of purposeful conduct. Once the creditor establishes that the debtor had actual knowledge of the false statement, the debtor cannot overcome the inference of the intent to deceive with unsupported assertions of honest intent.

*Lawson*, 308 B.R. at 423 (citations omitted). As stated in the previous section, the Mellicans established Bennett had actual knowledge of the false statements. At a minimum the Mellicans established recklessness. Bennett was experienced in his business and knew the jobs, sales, and diminishing bank balances. His post-closing conduct further establishes an intent to deceive. He contacted Moore and Berrios, who were then working for the Mellicans, asking them to delete information. He moved money from the Super Clean accounts before the dispute "got ugly". Finally, the sheer number of misrepresentations establishes an intent to deceive. *See First Neb. Bank v. Balfour (In re Balfour)*, Adv. No. 18-8337, 2020 WL 412184, at *9 (Bankr. D. Neb. Jan. 24, 2020) (one of the "badges of fraud" is the "existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit").

## Conclusion

Judgment will be entered in favor of the Plaintiffs and against defendant Dannie L. Bennett, Jr., in the amount of $764,000, which judgment is excepted from discharge under 11 U.S.C. § 523(a)(2)(B). All claims against Maria J. Bennett are denied. A separate judgment order will be entered.

Dated: October 1, 2024

BY THE COURT

/s/ Brian S. Kruse
Brian S. Kruse,
Bankruptcy Judge